APPEALS OF J. A. BENTLEY AND E. W. ZIMMERMAN.

Docket Nos. 2512, 2513.   Decided October 30, 1926.

1. A corporation which was legally organized in 1908, but which never issued any shares of stock or received any assets of any description, or transacted any business whatever, derived no income from a business operated by a partnership, which, at the time the corporation was formed, it was intended the corporation should take over and carry on.

2. A taxpayer is entitled to deduct from gross income in his income-tax return his proportionate share of any net loss actually sustained by a partnership of which he was a member within the same taxable year as a result of the embezzlement of moneys by an employee of the partnership, unless such loss has been included in the computation of the distributive income of the partnership, but the amount of the deduction to which such partnership is entitled in computing net income on account of the embezzlement is limited to the amount of the loss actually sustained within the taxable year; and, where the embezzlements have covered a series of years and the amount thereof can not be determined, the partnership is limited to the deduction of a loss in the year under review of the amount of the embezzlement proven for that year.

3. Where individuals on January 2, 1919, sell to a corporation organized on December 31, 1918, certain assets in exchange for shares of stock of the corporation, any loss sustained upon the transaction is deductible from the gross income of the year 1919 and not of the year 1918.

4. The depreciated cost or cost of reproduction of property on March 1, 1913, is not evidence of the fair market price or value of the property on the same date.

*Albert L. Hopkins, Esq., R. S. Doyle, Esq.,* and *L. Dana Latham, Esq.,* for the petitioners.

*C. H. Curl, Esq.,* for the Commissioner.

The Commissioner found deficiencies in income taxes of J. A. Bentley for the years 1917, 1918, 1919, and 1920, in the respective amounts of $24,586.31; $109,184.94; $10,488.44; and $17,819.54, a total of $162,079.23; and of E. W. Zimmerman for the same taxable years, in the respective amounts of $8,375.26; $30,306.58; $3,853 and $7,148.14, a total of $49,682.98.   The issues pleaded by the taxpayers being identical, a motion to consolidate the appeals for hearing and decision was granted.

The issues pleaded in behalf of the taxpayers are:

(1) The Commissioner erroneously determined a taxable net income of the Hotel Bentley Co., a partnership, in 1917, in the amount of $16,887.08, and added to the gross income of the taxpayers their respective shares of such distributive income.

(2) The Commissioner refused to allow the taxpayers to deduct from their respective gross incomes, in their income returns for 1917,

their proportionate shares of a net loss in the amount of $142,588.69, which the Hotel Bentley Co. is alleged to have sustained in that year.

(3) In computing the net income of the Hotel Bentley Co. for the year 1918, the Commissioner disallowed as a deduction from gross income the amount of $317,998.86, alleged as a loss sustained in that year by the partnership in the sale of all its assets to the Hotel Bentley Co., Inc.

(4) The Commissioner refused to allow the taxpayers to deduct from their respective gross incomes, in their income-tax returns for 1918, their proportionate shares of a net loss in the amount of $295,307.49, which the Hotel Bentley Co. is alleged to have sustained in that year.

At the hearing the Commissioner amended his answers to the tax-payers' petitions, denied that the Hotel Bentley Co. was a partnership during the years 1917 and 1918, or at any other time, and asserted that it was in fact a corporation during such years. The taxpayers presented no evidence to support their allegations that the deficiencies for 1920 were erroneously determined, leaving only the years 1917, 1918, and 1919 in controversy.

### FINDINGS OF FACT.

On or about January 1, 1907, J. A. Bentley, of Alexandria, La., and E. W. Zimmerman, of Zimmerman, La., partners in the J. A. Bentley Lumber Co., of Alexandria, decided to build a high class hotel at Alexandria. The town of Alexandria, in Rapides Parish, is the center of a rich lumber district and at that time had a population of about 11,000. There was then no first class hotel in the town. The agreement between Bentley and Zimmerman for the construction of the hotel was oral, but the parties agree that Bentley was to have a three-fourths interest and Zimmerman a one-fourth interest therein. Pursuant to the agreement, Bentley purchased two tracts of real estate in Alexandria in 1907, at a total cost of $40,000. The title to each tract was taken in the names of Bentley and Zimmerman.

The construction of the hotel was begun in 1907. Bentley had first contemplated building a hotel with 100 rooms, at a cost of not to exceed $300,000, and had gone ahead with plans for that for some time, but later decided upon a building with 168 guest rooms. He thought that a hotel of such size would take care of the needs of the town for many years to come, and that there was little likelihood that such a hotel would be superseded by a larger and better building. It was built on a cost plus 10 per cent basis. It was built of stone, steel reinforced concrete, and brick, and, as nearly as possible,

was fireproof. It was elaborately built; the lobby is unusually large. The furnishings are of fine quality and the hotel compares favorably with first class hotels of much larger cities. The total cost of the land, buildings and improvements was from $650,000 to $700,000. The cost was paid partly by Bentley and partly by Zimmerman. The J. A. Bentley Lumber Co., in which Bentley and Zimmerman were partners, advanced a part of the money for the construction. The amounts thus advanced were charged to Bentley's and Zimmerman's individual accounts. The checks drawn by Zimmerman, by Bentley, and by the J. A. Bentley Lumber Co. were deposited in the First National Bank of Alexandria in the name of the Hotel Bentley. Paul Lisso, an officer of the bank, signed the checks in payment of construction costs as treasurer of the Hotel Bentley The hotel was opened for business on or about April 1, 1908.

Subsequent to the completion and opening of the hotel, Bentley and Zimmerman contemplated the formation of a corporation to take over and operate the property. Articles of incorporation were drawn up and executed in the office of Louis J. Hakenyos, Bentley's attorney, and duly recorded with the local recorder of Rapides Parish on August 15, 1908. The name of the corporation is designated in the articles of incorporation as Hotel Bentley Co., Ltd. All of the formalities of incorporation required by the statutes of Louisiana were complied with, except that a copy of the articles of incorporation was not filed in the office of the Secretary of State. The charter stated that the capital stock of the corporation shall consist of 7,000 shares of a par value of $100 each, of which 4,666 were subscribed for by J. A. Bentley, 2,333 by E. W. Zimmerman, and 1 by Paul Lisso. The Hotel Bentley Co., Ltd., never acquired title to the real estate or other hotel property held by Bentley and Zimmerman. No stock was ever issued or paid for. The corporation never operated the Hotel Bentley nor did it at any time have any money or any bank account.

At the request of the Commissioner, corporation excise-tax returns were filed for the hotel for the years 1909 to 1912, inclusive, and corporation income-tax returns were filed for the years 1913 to 1915, inclusive. The return filed for the year 1909 was executed by J. A. Bentley, president, and by Paul Lisso, treasurer. Returns for subsequent years purport to have been signed by J. A. Bentley, president, by one Barnes, the manager of the hotel, who was authorized to sign Bentley's name to checks in connection with the financial operations of the hotel. The Rapides Parish tax assessment rolls show that taxes for the years 1909 to 1913, inclusive, were assessed against Bentley Hotel Co., Ltd. For the years 1914 to 1918, inclusive, the taxes were assessed against J. A. Bentley, individually.

The change was made at the instance of Bentley, who advised the assessor that the taxes should be assessed against him. The excise and income-tax returns filed for Hotel Bentley Co., Ltd., for the years 1909 to 1915, show net losses as follows:

| | |
|---|---:|
| 1909 | $28,938.90 |
| 1910 | 23,637.44 |
| 1911 | 7,560.48 |
| 1912 | 12,527.20 |
| 1913 | 14,906.85 |
| 1914 | 21,790.21 |
| 1915 | 14,318.67 |
| | 123,679.84 |

The first manager of the hotel resigned in 1911 and was succeeded by T. L. Barnes, who brought with him one George Lawrence, a bookkeeper. Barnes and Lawrence remained as manager and bookkeeper, respectively, until May 1, 1917. Barnes was married and his wife was employed as housekeeper of the hotel. Throughout the period of his employment Barnes received a salary of $150 per month, plus room and board; his wife received $75 per month, plus room and board; and Lawrence received $100 per month, plus room and board. Barnes was given a free hand in the operation of the hotel during all this period. At stated intervals and at the end of each year Barnes reported to Bentley, who from the date of the opening of the hotel occupied a suite of rooms at the hotel, the results of operation. He usually informed Bentley that the hotel was about breaking even, although several times he called upon Bentley to advance money for the payment of taxes and other bills.

In April, 1917, Bentley's suspicions as to the honesty of Barnes and Lawrence was aroused by the fact that representatives of Armour & Company and Swift & Company came to him asking him personally to guarantee current bills for supplies furnished the hotel. They had been unable to make collections in regular course and, not understanding whether Bentley was personally responsible, approached him upon the subject. At about the same time he also learned of the extravagant habits of Barnes, and at the suggestion of a business associate he called in a public accountant by the name of Robinson to make an audit of the books of account. At about this time Bentley had words with Lawrence, who suddenly disappeared. As soon as Robinson was called in, Barnes destroyed a great many vouchers and records relating to the finances of the hotel. After Robinson had made a preliminary investigation he formed the opinion that the moneys and other property of the hotel were being embezzled. A few days after the investigation was begun, and after

he had been informed that he would be discharged as manager, Barnes committed suicide.

The accountant completed an audit from the inaccurate and incomplete records which he could obtain. This audit showed, among other things, that the hotel had operated at a loss from January 1 to April 30, in 1917, the estimated amount being $14,933.33, and that the total deficit resulting from operations from the date of its opening to April 30, 1917, was $164,036.93. This audit report is dated June 22, 1917. Employees in the hotel and others having knowledge of the circumstances told the auditor of considerable waste and misappropriation of the hotel's supplies and liquors by Barnes and Lawrence.

Hotel checks made by Barnes in 1917 for payment of personal debts were found, but there was no record that they had ever been charged to his personal account. The following is a list of these:

| | |
|---|---|
| Wolf Shirt Co., Kansas City | $650.00 |
| Simon Bros. (hardware merchants, Alexandria, La.) | 800.00 |
| Winberg's Livery Stable, Alexandria, La | 130.00 |
| House in Olathe, Kans | 6,200.00 |
| Conrad Beauty Parlor, Alexandria, La | 1,000.00 |
| Total | 8,780.00 |

In 1917, Barnes sold certain billiard tables belonging to the hotel for $1,500 and did not account for the cash in the hotel receipts.

Shortly after Barnes' death and as soon as Robinson's audit was completed, Bentley and Zimmerman undertook to collect from Barnes' estate any amounts they could lay their hands on. It was not clear, however, that Lawrence embezzled anything. The assets of Barnes' estate consisted of wearing apparel, jewelry and other personal effects, insurance policies payable to his widow, and a house in Olathe, Kans., valued at about $5,000. Barnes' widow offered to pay Bentley and Zimmerman $5,010, the value of the house in Olathe, which they, on advice of counsel, accepted in full settlement of their claims against Barnes' estate. The charge made by Robinson for his services in auditing the books was $1,000.

Robinson opened a new set of books for the Hotel Company as of May 1, 1917. The books of account for the balance of the calendar year were kept under his direction. He made an audit of such books shortly after the close of the year 1917, and in his report to the partnership, dated February 14, 1918, he reported that the earnings of the hotel for the last eight months of the year amounted to $17,-946.69. In this audit he also adjusted the estimated operating deficit for the first four months of the year 1917 and found that the actual loss for such period was $15,441.78. He computed the net loss of the partnership for the calendar year 1917 as follows:

| | | |
|---|---:|---:|
| Deficit to April 30, 1917 | $164, 036. 93 | |
| Error in computing such deficit | 508. 45 | |
| Audit expense | 1, 000. 00 | |
| | | $165, 545. 38 |
| From Barnes' estate | 5, 010. 00 | |
| Earnings May 1 to Dec. 31 | 17, 946. 69 | |
| | | 22, 956. 69 |
| Net loss for year | | 142, 588. 69 |

In making up this net loss the accountant assumed that approximately the entire amount of the deficit existing at April 30, 1917, was attributable to the defalcations of Barnes and Lawrence. The taxpayers have allocated all the defalcations to the year 1917.

Balance sheets set up by Robinson at April 30, 1917, and December 31, 1917, read as follows:

ASSETS.

| | Apr. 30, 1917. | Dec. 31, 1917. |
|---|---:|---:|
| Cash | $350. 00 | $11, 276. 22 |
| Accounts receivable | 35. 00 | 3, 991. 81 |
| Storeroom inventory | 1, 742. 12 | 3, 446. 27 |
| Wine and liquor inventory | 2, 935. 43 | 11, 212. 33 |
| Real estate and building | 540, 454. 44 | 540, 454. 44 |
| Furniture and fixtures | 62, 545. 56 | 63, 874. 01 |
| Linen | 8, 000. 00 | 8, 135. 45 |
| Glassware and crockery | 7, 000. 00 | 7, 024. 88 |
| Silverware | 7, 200. 00 | 7, 891. 46 |
| Licenses, etc., prepaid | 1, 270. 00 | |
| | 631, 532. 55 | 657, 306. 87 |
| Less reserve for depreciation | 8, 533. 33 | 25, 599. 81 |
| | 622, 999. 22 | 631, 707. 06 |
| Deficit | 164, 036. 93 | 142, 588. 69 |
| | 787, 036. 15 | 774, 295. 75 |

LIABILITIES.

| | | |
|---|---:|---:|
| Accounts payable | $26, 744. 59 | $11, 890. 53 |
| Notes payable | 60, 000. 00 | 45, 000. 00 |
| Payroll | 1, 509. 17 | 2, 207. 65 |
| Reserve for taxes | 1, 625. 00 | 5, 054. 18 |
| J. A. Bentley—personal | 71, 590. 72 | 84, 576. 72 |
| E. W. Zimmerman—personal | 366. 67 | 366. 67 |
| J. A. Bentley—capital | 468, 900. 00 | 468, 900. 00 |
| E. W. Zimmerman—capital | 156, 300. 00 | 156, 300. 00 |
| | 787, 036. 15 | 774, 295. 75 |

In computing the income of the hotel for the year 1917 the accountant deducted from gross income $25,599.81 for depreciation, which amount included $15,000 for depreciation of the hotel building. In the audit of the taxpayers' returns for 1917 the Commis-

sioner disallowed $4,990.91 of the depreciation claimed on the hotel building in computing the income of the partnership.

In 1918 it was suggested to Bentley that a corporation should be organized to take over the hotel; that a corporation could manage the hotel to better advantage, and that the stockholders would thereby be saved from personal losses. Acting upon this suggestion, the charter of Hotel Bentley Co., Inc., was drawn up and executed under date of December 31, 1918. The capital stock of this corporation was fixed at $200,000. The charter provided that capital stock might be paid up in property, but if so paid up the property should be appraised. For this purpose an appraisal of the hotel property and other assets of the partnership was made. Such appraisal was made by J. A. Bentley and P. F. Appel under date of January 1, 1919. The assets were appraised at a total of $250,000. On January 2, 1917, Bentley and Zimmerman transferred all of the Hotel Bentley property to the newly organized corporation, in accordance with the oral agreement entered into with the subscribers at the date the articles of incorporation were drawn up. The charter was placed on record in the office of the recorder in Rapides Parish, La., on January 10, 1919. It designates J. A. Bentley as president, E. W. Zimmerman as vice president, and P. F. Appel as secretary and treasurer. The stock of the new corporation was subscribed for as follows:

|  | Shares. | Amount. |
|---|---|---|
| J. A. Bentley of Alexandria, La_____ | 1,200 | $120,000 |
| E. W. Zimmerman of Alexandria, La. per J. A. Bentley_____ | 400 | 40,000 |
| O. G. Zoder of Alexandria, La_____ | 20 | 2,000 |
| H. C. Collier of Alexandria, La_____ | 20 | 2,000 |
| H. H. Furby of Alexandria, La_____ | 50 | 5,000 |
| P. F. Appel of Alexandria, La_____ | 50 | 5,000 |
| F. M. Friel of Alexandria, La_____ | 50 | 5,000 |
| Gus Gehr of Alexandria, La_____ | 50 | 5,000 |
| H. D. Foote of Alexandria, La_____ | 50 | 5,000 |
| W. D. Hill of Alexandria, La_____ | 50 | 5,000 |
| L. J. Hackenyos of Alexandria, La_____ | 50 | 5,000 |
| W. O'Shee of Alexandria, La_____ | 10 | 1,000 |

The subscribers were for the most part employees of the hotel and business associates of Bentley in Alexandria. None of the stock was paid for in cash. Certificates of stock were issued to the subscribers who endorsed them in blank and turned them over to Bentley, together with interest-bearing promissory notes, in payment therefor. The certificates, together with the promissory notes attached thereto, were held by Bentley. None of these notes has as yet been paid, nor has any interest been collected on them.

The fair market price or the value of the land on which the Hotel Bentley was located on March 1, 1913, was $40,000. The original cost of the hotel building was approximately $600,000. The

depreciated cost at March 1, 1913, was $540,000. The depreciated cost of the furniture, fixtures and equipment at March 1, 1913, was $52,000. The cost of reproduction of the Hotel Bentley building on the same date was approximately $540,000.

### OPINION.

LANSDON: In his amended answers, filed at the hearing, without objection from the taxpayers, the Commissioner denied that the Hotel Bentley was owned and operated during the years 1917 and 1918 by a partnership composed of J. A. Bentley and E. W. Zimmerman, with respective interests of three-fourths and one fourth therein, and alleged that such hotel was erected, owned and operated during the years 1917 and 1918 by the Hotel Bentley Co., Ltd., a Louisiana corporation organized in 1908. The issue so raised must be decided before any consideration of the other matters in controversy.

The record discloses that the charter of a corporation designated as the Hotel Bentley Co., Ltd., was recorded in the office of the recorder of the Parish of Rapides, State of Louisiana, on August 15, 1908. There is conclusive evidence, however, that such corporation never issued any stock; never acquired the property known as the Hotel Bentley from the owners thereof, Bentley and Zimmerman; never had any bank account, and that it never operated the Hotel Bentley either as owner or lessee of such property. If such a corporation had any legal existence during the years 1917 and 1918, it was a mere shadow without substance or function. The corporation excise and income-tax returns for the years 1909 to 1915, inclusive, made in the name of the Hotel Bentley Co., Ltd., were without authority or legal effect, since they were the returns of a corporation which was not engaged in the business the income and expenses of which they purported to show. The gains and losses of the Hotel Bentley, with which we are concerned here, were not the gains and losses of the shadow corporation which never issued any stock, acquired any property or at any time operated this hotel. We are fully persuaded that all such gains or losses were the gains or losses of the partnership composed of Bentley and Zimmerman.

The second issue presented for our consideration is the determination of the true tax liability of these taxpayers, resulting from the operation of the Hotel Bentley during the year 1917. The taxpayers aver that the hotel was operated during such year at a loss of $142,588.69, and in their income-tax returns each of them deducted his proportionate share of such alleged loss from his gross income for that year. The Commissioner disallowed these deductions, held that the partnership realized a net income in the amount of $16,887.08,

and added three-fourths and one-fourth of such amount to the respective gross incomes of Bentley and Zimmerman.

Some time in 1911, Bentley, presumably with the consent of Zimmerman, employed one T. L. Barnes as manager of the hotel. In April, 1917, Bentley became suspicious of the integrity of Barnes and employed a certified public accountant to audit the accounts and books of the hotel and to make a report of the result of such audit. The accountant discovered gross discrepancies between the cash collections reflected in the books of the various cashiers and the record of such collections in the regular books of account kept by one Lawrence under the direction of Barnes. He also found that many of the earlier books and records relating to the hotel had been lost or destroyed, and that many of the vouchers and invoices relating to the business of the hotel for the time immediately preceding the audit had been destroyed by Barnes.

From all the data available the auditor reached the conclusion that the hotel should have been operated at a profit and that Barnes and Lawrence, in collusion with each other, had embezzled hotel funds and property in the amount of at least $175,000. The report of the auditor dated June 22, 1917, showed an operating deficit from the opening of the hotel in 1908 to April 30, 1917, in the amount of $164,036.93, of which $14,983.33 was ascribed to the period from January 1 to April 30, 1917. At the close of the year 1917 the same accountant made an audit covering operations from April 30 to December 31, 1917, and reported net operating earnings for that period in the amount of $17,946.69. He then made some minor adjustments, assembled the results of his audits and determined that the net operating deficit at that date was $142,588.69.

Upon the theory that the entire operating deficit resulted from the alleged peculations of Barnes and Lawrence and was a loss sustained in 1917 because it was ascertained in that year, the taxpayers deducted proportionate parts of such deficit from their respective gross incomes in their income-tax returns for such year as losses sustained during the year. The Commissioner disallowed all the alleged loss from defalcation, except the amounts proved to have been embezzled within the taxable year, disallowed part of the depreciation taken on the building, and determined a net income for the Hotel Bentley for the year 1917 in the amount of $16,887.08.

The taxpayers have not convinced us that the entire amount of $142,588.69 is a deductible loss of the Hotel Bentley for 1917. There is no conclusive evidence that the entire deficit resulted from the peculations of Barnes and Lawrence. On the other hand, there is proof that the hotel lost much money before Barnes was employed, and there is good reason to believe that it was not meeting its operating expenses during the earlier years of such employment. In any

event it is not enough for the taxpayers' purpose in this proceeding to prove that the entire deficit resulted from the alleged embezzlement. In order to sustain their claim for deductions on this account they must show in what years and in what amounts their property was embezzled. This they have not done except as to the comparatively small amounts traced to Barnes in 1917 and in part recouped by a payment of $5,000 by Mrs. Barnes after the death of her husband. In the case of *United States* v. *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.*, U. S. Dist. Ct., So. Dist. Ohio, February 23, 1916 (not reported) the court said:

> The time of the discovery of a loss bears no relation to the loss sustained. The loss was sustained when the theft occurred, although the defendant did not know at the time of the depletion of its assets. As each embezzlement occurred, the defendant was poorer to the extent of it. It then sustained a loss.

Inasmuch as the proved defalcations are included in the operating deficit of the hotel for the period from January 1, 1917, to April 30, 1917, they require no separate consideration in computing the net income of the taxpayers for the year 1917. The evidence shows that from January 1 to May 1, 1917, the estimated operating deficit of the Hotel Bentley was $14,933.33 and that the actual deficit for that period was later ascertained to have been $15,441.78. The net operating earnings as reflected by the books and reported by the auditor for the period from May 1 to December 31, 1917, was $17,946.69. It is obvious, therefore, that the net income of the hotel for the year 1917, which is the taxable period, was $2,504.91, unless errors in the computations of the petitioners are established. In computing the net income of the hotel for 1917, a deduction on account of depreciation of the building was taken in the amount of $15,000. The Commissioner disallowed this in part and allowed depreciation at the rate of 2 per cent. We are of the opinion that 2½ per cent should be allowed on a valuation of $540,000 at March 1, 1913.

The third issue for our consideration is whether the partnership sold the assets of the Hotel Bentley Company, on December 31, 1918, or at some date in the year 1919. The taxpayers contend that all the material steps in this transaction were taken in 1918 and that the partnership, by virtue of an oral agreement to form a corporation and convey the hotel assets thereto when formed, parted with the beneficial title to such property at the date of the agreement to incorporate and from that time became a trustee for the stockholders of the proposed corporation, even though its legal ownership continued until the date of the actual transfer by deed. The evidence that any agreement to transfer the assets was entered into in 1918 is not convincing. If there was such an agreement, it was oral and we are not fully informed as to its terms. It is true that the

charter of the Hotel Bentley was executed December 31, 1918, but the assets to be exchanged for stock were not appraised as the law of Louisiana requires until January 1, 1919, and the deed transferring the assets was not executed until January 2, 1919, on which date such assets were formally proffered to the corporation and formally taken over by appropriate corporate action, as. disclosed by the official minutes of the Hotel Bentley Co., Inc.

In support of their contention the taxpayers cite *African M. E. Church* v. *Conover*, 27 N. J. Eq. 157, wherein the court holds:

Where a purchase [of land] is made by several persons representing a voluntary association * * * for the common benefit of all the persons composing the association, and the purchase money is paid, and possession of the land given, equity raises a promise by the vendor to make a title, either to the persons making the payment, or to the corporation, if one be created.

In such case, the vendor, as to the title, becomes a trustee for the purchasers; and they being the mere agents of the voluntary association, the moment the association is incorporated, it has a right to a conveyance from the vendor.

We are not convinced that the authority relied on by the taxpayers sustains their contention. The facts are easily distinguished. Our question is whether these taxpayers sold their property to the Hotel Bentley Co., Inc., in 1918, or, by their agreement to form a corporation and their execution of the charter of the proposed corporation, so obligated themselves that from the date of such agreement and execution they ceased to be, and the corporation became, the benefical owner of the property. Inasmuch as the proposed incorporation was not concluded in 1918, and no offer of sale was made in that year, we are of the opinion that the sale of the property to the Hotel Bentley Co., Inc., was made in 1919 and that such sale does not affect the tax liability of the taxpayers for 1918.

The only remaining question relating to the deficiencies asserted for 1918 is the correct rate of depreciation of the hotel building, which we have held as to 1917 should be 2½ per cent on a basic value of $540,000. The income of the taxpayers for 1918 should also have the benefit of the increased rate of depreciation which we have allowed.

We must now determine the gain or loss resulting to the partnership from its sale of its hotel assets to the corporation in 1919. For such assets the corporation issued its stock of the par value of $200,000 and assumed liabilities of the partnership in the amount of $89,955.44. The taxpayers contend that the fair market value of the stock received was not in excess of $289,955.44. It is in evidence that, at or about the date of the transfer, shares of stock were sold at par in the amount of $40,000, that a profitable department of the hotel's business had just been abandoned on account of Federal prohibition, and that except during the war there had been small profits, if any, from the operation of the property. We are convinced that $289,955.44 was the fair market value of the stock re-

ceived for the hotel property at the date of its transfer to the corporation.

The partnership received $289,955.44 for its assets after January 1, 1919. Did it sustain a loss or realize a profit? To answer this question the law requires us in the case of property acquired prior to March 1, 1913, to determine the fair market price or value of the assets at that date. In this case, the market price can not be determined from any offers or sales. We must therefore resort to some other method for determining its fair market value at the basic date.

There are two elements of the composite value of the hotel property at March 1, 1913, that are not in dispute. The site cost $40,000 in 1908 and was not less valuable in 1913. The hotel equipment cost $75,000 and there is ample evidence that this value was maintained, less an annual depreciation of 10 per cent, and that it had a fair market value of $52,000 at March 1, 1913.

We have found that the depreciated cost of the building at March 1, was $540,000. The taxpayers contend that in the absence of an established market price the depreciated cost represents the fair market value. With this contention we can not agree. It is in evidence that when constructed the Hotel Bentley was in advance of the needs of the town and that with due consideration for the losses that may have resulted from embezzlements it had not been operated at a profit prior to the basic date. Admitting these adverse conditions, we believe that this building had a very substantial value at March 1, 1913. Alexandria was and is a rapidly growing city, situated in the heart of a rich lumbering and farming district. ' The Bentley was the only good hotel in the city or in that immediate territory. At March 1, 1913, there was no reason to believe that the property would not soon become profitable. The evidence convinces us that from such date it might have been operated at a profit but for the peculations of Barnes and Lawrence. To sustain their contentions of value the taxpayers introduced opinion evidence by many witnesses qualified to pass on the value of such property. These witnesses testified to reproductive values of the property at March 1, 1913, ranging from $550,000 to $650,000. It is our opinion that the fair market value of the hotel building at March 1, 1913, was $450,000; of the land, $40,000; and of the furniture and equipment, $52,000, or a total of $542,000, and this amount should be used as the basis for determining the loss sustained by the partnership when it sold the property to the corporation in 1919. It follows therefore that each of the taxpayers is entitled to deduct his proportionate share of the loss so sustained and computed from his gross income for 1919.

*Judgment will be entered on 15 days' notice, under Rule 50.*